CASE 19—PETITION EQUITY—APRIL 24.

# Gartin, &c., vs. Penick, &c.

APPEAL FROM MARION CIRCUIT COURT.

1.  In 1857, Penick conveyed to Chandler and others, in trust for the use of the "Bethel Union Church," several acres of land in Marion county, on which that church, then affiliated with the New School organization of Presbyterianism, erected a new house of worship.

   Nearly a year after this conveyance of 1857, the members of the "Bethel Union" unanimously joined the "Old School" organization.

   The deed of 1857, duly acknowledged and recorded, was burnt with the records of the clerk's office in 1863.  In 1865 Penick, without authority, conveyed the same house and land to other trustees for the use of the "*Bethel Union Church, adhering to the General Assembly.*"

   In 1867 Penick, and about half the members of the church adhering to the General Assembly, claimed and asserted the right to the

exclusive use of the church property, whilst Gartin and the other members protesting against certain *deliverances* of the General Assembly, asserting the like right to the church property, proposed, as a compromise, an equal and alternate enjoyment of the property.

The circuit court, in this suit, adjudged to Penick and his associates the exclusive use of the church property; and Gartin and his associates, claiming in the court below the right to an equal and alternate enjoyment of the church property, appealed from that decision. *Held*—

*First.* That, by invoking it, both parties acknowledged the jurisdiction of the civil power of the State.

*Second.* A church, like every other organized body of citizens, must be consolidated by an organic law, and under and according to the Constitution of the United States.

*Third.* The organic law of the Presbyterian Church is a fundamental compact, voluntarily made between all its members of the unincorporated association, for the guidance and protection of each constituent church and member, and necessarily inviolable, by any delegated power of the aggregate church.

*Fourth.* The Presbyterian Church is certainly as much bound as Congress by the Federal Constitution, and all its members are subordinate to that and the State Constitutions, which are supreme over all citizens in every condition.

*Fifth.* So far as civil rights and duties are concerned, the civil government has supreme authority to rule; and to that extent every citizen of every grade and condition owes a paramount allegiance to that sovereignty, and is reciprocally entitled to its protection over all other human power.

*Sixth.* Civil tribunals have jurisdiction over controverted claims to the use of church property, both in England and in this country. (*See opinion for list of authorities.*)

2. While the general desire of courts of law is to avoid ecclesiastical or spiritual questions, they find it impossible wholly to do so. If a body of men have wrongful possession of a church or of a sum of money, on the pretense, for example, that they are the religious body to which the money or the building was destined, their opponents have no way of redressing the wrong and vindicating their own rights, except by appealing to the civil tribunals of the country; and civil tribunals have no means of doing justice, except by investigating into the differences of doctrine, discipline or practice, which, to the litigants, may be religious differences, but to the judge are

mere matters of fact, bearing on a question of civil right. (*The Law of Creeds in Scotland by an eminent jurist, p.* 323.)

3. The contract under which the two antagonistic organizations in this case, claim, *is purely civil*, and not ecclesiastical; and the usufructuary rights resulting from it, depend on the laws of the land, and not on the *arbitrium* of the General Assembly of the church, which has no civil power. Penick's conveyance of 1857 is the only legal document of title to the church property, and it conveyed the property simply to, the church, without regard to its external connections with the Old School General Assembly, but only as a Presbyterian organization. This conclusion is fortified by the fact that the beneficiary was then attached to the New School.

4. The fact that, some time after the conveyance of 1857, the members of that united church unanimously left the New, and joined the Old School, did not either affect their identity, or, *per se*, subject their property to the jurisdiction of the General Assembly, or change their tenure of it, so as to make it dependent on adherence to that council; and—

5. According to this conclusion, the appellants, Gartin and his associates, are entitled to participation in the use of the dedicated property.

6. If the appellants held their interest in the church property by the tenure of adherence to the General Assembly, a severance of that connection, by the unauthorized acts of the General Assembly, cannot affect the title to the property. They are still, in every essential element of identity, the same "Bethel Union Church" as always heretofore. There might be more reason for saying that the General Assembly had lost its own identity.

7. The only valid title was passed by the deed of 1857, which contained no condition of adherence to the General Assembly; and the reorganized church of appellants, Gartin and others, called "Bethel Union," not having lost its essential identity, as now organized in a church capacity, have a right to use the property of the "Bethel Union" Church; but whether the appellees, Penick and others, are entitled to any use, is not decided on the issue made between the litigants, whereby appellants claim only half of the use, as stipulated by compromise.

W. B. HARRISON,                               For Appellants,
                    CITED—

2 *Starkie's Ev., p.* 271.

12 *Johnson*, 536; *Verplank vs. Steany, &c.*

13 *Johnson*, 285; 18 *Johnson*, 544.

16 *Peters*, 119–20; *Tompkins vs. Wheeler.*

*Constitution and Form of Government and Proceedings of General Conventions and Synods of the Presbyterian Church.*

W. J. LISLE and
HARLAN & NEWMAN,                                  For Appellees,
CITED—

7 *B. Mon.*, 481; *Gibson, &c., vs. Armstrong.*

3 *B. Mon.*, 258; *Shannon vs. Frost.*

2 *Bush*; *Watson, &c., vs. Avery, &c.*

14 *B. Mon.*, 56; *Harper vs. Straws.*

*Constitution and Form of Government of Presbyterian Church.*

*Proceedings of General Conventions and Synods of Presbyterian Churches, and "Declaration and Testimony" of Kentucky Synod.*

4 *Bush*; *Burnsides vs. Humphreys.*

7 *Dana*, 190; *Curd, &c., vs. Wallace, &c.*

JUDGE ROBERTSON DELIVERED THE OPINION OF THE MAJORITY OF THE COURT:

This litigation between conflicting sections of a once harmonious, but now discordant body of Presbyterians, involves fundamental principles in church and State peculiar to our own jurisprudence, and essential to the purity of religion and to the civil liberty contemplated by the Constitutions of the Anglo-American Union and States.

As early as the year 1828, a Presbyterian Church, called the "*Bethel Union*," was organized in Marion county, Kentucky. In the year 1857, the appellant, B. N. Penick, who was a member of that church, conveyed to Chandler and others, in trust for its use, several acres of land, on

which it erected a new house of worship. That dedica-
tion was to "The Bethel Union Church" without any
other description or limitation. At that time this church
was affiliated with the "New School" organization of
Presbyterianism. The deed of 1857, duly acknowledged
and recorded, was burnt with the records of the clerk's
office in the year 1863; and Penick, in the year 1865,
made, without authority, another conveyance of the same
house and ground to other trustees for the use of the
"Bethel Union Church, *adhering to the General Assembly.*"
Nearly a year after the conveyance of 1857, the mem-
bers of the "Bethel Union" unanimously joined the "Old
School" organization.

Until about the year 1861, the members of this church
appear to have harmonized as a fraternal unit in the use
of the church property, and afterwards to have continued,
though rather discordantly, the joint use of it, until the
year 1867, when certain "deliverances," and other dis-
turbing acts of the General Assembly, hereafter to be
considered, had culminated in a partial disruption of the
Presbyterian Church as a national unity. After that
catastrophe, the appellee, Penick, and about half of the
other members of the "Bethel Union," adhered to the
General Assembly, and the appellant, Gartin, and his
associates, co-operated with the protesting party. Pen-
ick and his concurrent associates asserted and strove to
maintain a right to the exclusive use of the church prop-
erty, while Gartin and his party, asserting the like right,
proposed, as a compromise, an equal and alternate enjoy-
ment of the property. This conflict resulted in this ap-
peal by both parties to the civil tribunals of the State;
and here, without now noticing the voluminous pleadings
and testimony, it is sufficient to say, that the circuit court
adjudged to the appellees the exclusive use of all the

property of the "Bethel Union" Church; and that, by this appeal, the appellants seek a reversal of that judgment.

In revising the case, this court, in the logical and necessary order of consideration, must first dispose of the controverted question of jurisdiction by the civil power of the State, *and which both parties acknowledged by invoking its intervention.*

A church, like every other organized body of citizens, must be consolidated by an organic law; and, under and according to the Constitution of the United States, the organic law of the Presbyterian Church is a fundamental compact, voluntarily made between all the members of the unincorporated association, for the guidance and protection of each constituent church and member, *and necessarily inviolable by any delegated power of the aggregate church.* Its supremacy over all representative organs deriving their authority from it, and therefore subordinate to it, was the great end, and must be the necessary consequence of its adoption. It defines the sphere of the "General Assembly," as the organized representative of all the members of the Presbyterian Church, as a Christian nationality, *subordinate to the political sovereignty of the civil union,* which is as supreme over members of churches as over any other citizens. Hence, all acts of the General Assembly not sanctioned by its own, as well as the Federal Constitution, are, like ultra-constitutional acts of Congress, void; and that which is void can impose no obligation, even on the conscience. As no act of an agent is the act of the principal, except so far as it was authorized by the charter or other contract of delegation, so the constituent body in either church or State is not bound by any act of its organic representative—legislative, judicial, or executive—unauthorized by

its charter of authority. No such unauthorized act of Congress or of the General Assembly can be law; and it is even a misnomer to call it, as it is loosely called, " an unconstitutional *law*," instead of an unconstitutional *act;* for, being as much a legal nullity as if it had never been enacted, it is, in no sense, *law,* which is necessarily *supreme.*

The Presbyterian Church is certainly as much bound as Congress by the Federal Constitution; and all its members are subordinate to that and the State Constitutions, which are supreme over all citizens in every condition. So far as civil rights and duties are concerned, the civil government has the supreme authority to rule; and, to that extent, every citizen of every grade and condition owes a paramount allegiance to that sovereignty, and is *reciprocally entitled to its protection over all other human power.*

The fundamental institutions of this hopeful and eventful country of ours contemplate the liberty and progress of the human race—liberty in its sterling and most comprehensive sense, and progress upward and onward; and, as adaptable governments are indispensable to these beneficent ends, we have two kinds of government, congenially moulded and intended for harmonious co-operation—the one political and the other ecclesiastical—*each aiming at the security of liberty, civil and religious.* But, according to the Constitution of the United States, politics and religion move in separate spheres, clearly defined; and the tutelar genius of this *imperium in imperio* guards each from either consolidation or encroachment by one on the peculiar province of the other.

Christianity, though an essential element of conservatism, and a great *moral* power in the State, should yet only work by love, and inscribe the laws of liberty and

light on the *heart;* and the civil government has no just or lawful power over the conscience, or faith or forms of worship, or church creeds or discipline, as long as their fruits neither unhinge civil supremacy, demoralize society, nor disturb its peace or security. *Pure Christianity can live only in a serene atmosphere, unagitated by politics and unpolluted by hierarchical tyranny in any form over the conscience. This is the Christian's charter from the founder of his religion;* and it is equally true that the ecclesiastical should not interfere with the political government otherwise than by the influence of moral suasion and a Godlike example.

The political government is founded on the civil Constitution; the ecclesiastical, on the Bible; but the Bible and the Constitution harmonize in aim and in spirit, and religion and politics should go hand in hand together, each equally free, and neither presuming to control the other *in its legitimate sphere.* This is the true, and only true, illustration of the modern maxim, that church and State should be kept separate. It is the vital principle of both civil and religious liberty, and its universal prevalence would secure liberty, purify religion, and promote the welfare of mankind.

In the administration of this dual government, justly styled North American, let the political power confine itself to secular, and the ecclesiastical to spiritual interests and concerns, and all may be well, as anticipated by our fathers; and these fundamental doctrines are recognized *alike by the Bible and by the Constitution, and are also ratified by the organic law of the Presbyterian Church of these United States.*

Antecedently to the memorable year of 1788, the Presbyterian Churches in the United States, like their parental Church of Scotland, ruled by Sessions, Presbyteries, and

Synods, acknowledged a connection between church and State; but in that year, nearly simultaneously with the adoption of the Federal Constitution, those American churches confederated under a national head, called the General Assembly, then organized by an amended constitution for representing all the subordinate councils, and for acting as the ultimate council for *revision and advice in the ecclesiastical affairs of the aggregated church;* and that modified constitution, coevally and concurrently with the political Constitution of the United States, denounced all connection between the ecclesiastical and political governments, and pledged that church to the following fundamental doctrines:

"God alone is the Lord of the conscience, and hath left it free from the doctrines and commandments of men, which are in everything contrary to His word, or beside it, in matters of faith or worship; so that to believe such doctrines, or to obey such commandments out of conscience, is to betray true liberty of conscience; and the requiring an implicit faith, and an *absolute and blind obedience, is to destroy liberty of conscience and reason also."* (*2d sec., chap.* 20, *of Confession of Faith, p.* 113.)

The *2d section of the* 31*st chapter of the Confession of Faith,* as a part of the organic law of the church, defines the jurisdiction of synods and councils, and confines it to controversies of faith and cases of conscience, rules for public worship and government of the church, and "complaints in cases of maladministration," and, repudiating any other than moral coercion, prescribes "reverence and submission" as the only sanctions of "their decrees and determinations, *if consonant with the word of God;"* and the third and fourth sections are as follows:

3d. " All synods or councils, since the Apostles' times, whether general or particular, may err, and may have erred ; therefore, they are not to be made the rule of faith or practice, but to be used as a help in both."

4th. " Synods and councils are to handle or conclude nothing but that which is ecclesiastical, and *are not to intermeddle with civil affairs which concern the Commonwealth*, unless by *humble* petition in cases extraordinary, *or by way of advice for satisfaction of conscience, if they be thereunto required by the civil magistrate.*"

The political constitutions of the National and each of the State governments recognize, in various modes, these fundamental principles and doctrines of both church and State; and thus we may see that all our organic institutions harmonize on this delicate and interesting subject. Consequently, to a rational mind as free as a *tabula rasa*, there can be no plausible doubt that the General Assembly, as the head of the Presbyterian Church, can have no reasonable pretense for attempting control over any civil right or duty ; and that no department of the civil power has any semblance of authority to secularize the church, or interfere with the acts of the General Assembly in *constitutionally* exercising its ecclesiastical jurisdiction ; but the organic law of the church, like that of the State, being a contract between all the parties to it, and the members of the church being entitled, as citizens, to the protection of the paramount constitution of the State against all wrongful breaches of their contracts, the civil tribunals must have some rightful jurisdiction over the constitution of the church as a contract not less obligatory than any other contract between competent parties ; and those tribunals must have jurisdiction also to protect a member of the church against unconstitutional invasion of his

fundamental right to personal liberty and security, when-
ever attempted by his ecclesiastical government incon-
sistently with either its own constitution or that of the
political government.   A contrary assumption would
magnify the General Assembly beyond the sphere of its
own organic law, and install it as an arbitrary, infalli-
ble, and final power above all constitutional restraint;
and would thus exile members of the church from the
guardianship of the civil and only supreme human
power, which is bound to protect them as well as all
other citizens in their property and personal liberty;
but, as they joined the church with a knowledge of its
defined powers, and as the civil power cannot interfere
in matters of conscience, faith, or discipline, they must
submit to rebuke or excommunication, however unjust,
by their adopted spiritual advisers and ecclesiastical
rulers.   So far the jurisdiction of the General Assembly
is exclusive and final; but it has no such jurisdiction
over property, nor any authority to imprison a member
of the church, whose locomotive liberty as a citizen
must be protected by the civil power against all ecclesi-
astic or other usurpation.

Having thus drawn the line imperfectly, but, as we
think, truly, between civil and ecclesiastical power and
jurisdiction, we may be content with making it more
luminous and certain by a reference to a few adjudged
cases in Scotland and England corroborating our gen-
eral theory, and substantially confirmed by many Amer-
ican adjudications which we need not cite.   All those
cases involved the principles which control this case.

We cite the following cases only: *Craigdaltie's case on
an appeal from the Scotch Session to the British House of
Lords, Paton's Appl., Rep. VI,* 626; *Galbreath vs. Smith,
15 Shaw,* 808; *the Kirkintillock case,* 12 *Dunlop,* 523; *Forbes*

*vs. Eden, by the House of Lords; Dunbar vs. Skinner,* 11 *Dow's Appl. Rep.* These cases establish, for Great Britain, the jurisdiction of civil tribunals over controverted claims to the use of church property, and throw light on the boundary of ecclesiastical jurisdiction. In the first case in which civil jurisdiction was recognized by the House of Lords, Lord Eldon said that there was no doubt that, if an estate be conveyed to " trustees to be used for the purposes of religious worship, the courts of the country, acting on the principles of toleration, will enforce those persons to permit the property to be used for the purposes of that religious worship to which it was devoted." And in most of the cited cases the court assumed that, to settle the title in cases of schism, the faith and doctrines of each class of conflicting claimants may be considered incidentally for identifying the true beneficiaries, but not for revision of their creeds on the question of comparative orthodoxy.

If these be sound doctrines in a country where there is an established church connected with the civil power, and where Presbyterianism is non-conformity, and therefore unpatronized, and only tolerated, they must be, as often adjudged, sound here, where all forms and denominations are equally protected by the civil power, and unconnected with it.

Without more elaboration, we conclude that our jurisdiction in this case is sufficiently established by policy, principle, and authority.

This conclusion is perfectly consistent with the constitutional freedom of religion, the true interests of the Presbyterian Church, and the rightful and peaceful authority of its General Assembly; and the faithful exercise of the political and ecclesiastical jurisdictions, as thus defined, without the assumption of more by either power, would

harmonize religion and politics, liberate the church and the State, from strife and entanglement with each other, aid civil liberty, and promote the concord and purity and righteous progress of the church itself.

The opposite course would soon, even in this tolerant country and liberalized age—as always hitherto and elsewhere—adulterate the church, jeopard the peace and stability of the republic, and lead to an unhealthy consolidation which would degrade both the civil and ecclesiastic power from the lofty and self-poised position which they once mutually maintained.

The second question to be now considered is less important, but more difficult, than the first just disposed of in this opinion. Whether the appellants or the appellees, as now constituting separate churches, are entitled to the exclusive or alternate use of the property claimed by each party, depends on the essential identity of one or both of them with the Bethel Union Church to whose use that property was dedicated.

" While the general desire of courts of law is to avoid ecclesiastical or spiritual questions, they find it impossible wholly to do so. If a body of men have wrongful possession of a church or of a sum of money, on the pretense, for example, that they are the religious body to which the money or the building was destined, their opponents have no way of redressing the wrong and vindicating their own right, except by appealing to the civil tribunals of the country; and civil tribunals have no means of doing justice except by investigating into the differences of doctrine, discipline, or practice, which, to the litigants, may be religious differences, but to the judge are mere matters of fact, bearing on a question of civil right." (" *The Law of Creeds in Scotland,*" *by an eminent jurist, p.* 323.)

This is pre-eminently true in this country, where all property is secured by the supreme law of the civil power, and must be protected by the judiciary of that power, which, on *all* conflicting claims, must decide on the facts, *whatever they may be*, on which the title depends.
· The first section of article 12, of the Form of Government, page 429, makes the General Assembly "the highest judicatory of the Presbyterian Church;" and the sixth section, page 431, declares that no amendment to the constitution shall be obligatory until ratified by a majority of all the Presbyteries of the United States.

The seventh section of chapter 1, page 408, declares that "*the Holy Scriptures* are the only rule of faith and manners; that no church judicatory ought to pretend to make laws to bind the conscience in virtue of their own authority; and that all their decisions should be founded on the revealed will of God." And the second section, chapter 8, page 418, provides that "those *assemblies ought not to possess any civil jurisdiction nor to inflict any civil penalties; their power is wholly moral or spiritual, and that only ministerial and declarative*."

From the pleadings and proofs, the judicial deduction is inevitable that the appellants and the appellees, as now organized, constitute separate and antagonistic churches, each claiming to be the church to which the property in litigation was dedicated; and, consequently, the question now to be decided is one of identity, involving in its solution the equitable title to property dependent on contract, which this court must, when, as in this case, appealed to, interpret and uphold as well between ecclesiastical as civil bodies, or any other parties. The contract is purely civil, and not ecclesiastical, and the usufructuary rights resulting from it depend on the laws of the land, and not on the *arbitrium* of the Gen-

eral Assembly of the church, which has no civil power; but within the limits of the political and ecclesiastical constitutions, has supreme and final jurisdiction over church doctrines and discipline. The jurisdiction of the civil tribunals over church property does not, therefore, conflict with the exclusive jurisdiction of the General Assembly in the plenitude of its ecclesiastical power, either legislative or judicial. Without interfering with religious liberty, this court could not control or mould the faith or doctrines of the church; nor could it, consistently with the spirit of our institutions, authoritatively settle questions of orthodoxy or optimity among professing Christians. But, so far as the identity of the respective claimants with the beneficiary to whom the church property was dedicated may be affected by their doctrines or by the acts of the General Assembly, the essential coincidence of the doctrines and the legal effect of those acts must necessarily be considered for the purpose of deciding the question of title to the property without concluding the General Assembly, in any way, in its own proper jurisdiction in its ecclesiastical domain. This is no interference with vital Christianity, but leaves it free and undisturbed by the civil power, and may check its intermeddling, *as an organic power*, with civil and political rights, as individual citizens, whether in or out of the church, might rightfully do.

The pleadings and preponderating evidence authorize the judicial deduction that Penick's conveyance of 1857 is the only legal document of title to the church property, and the conclusion also that it conveyed the property simply to the church, without regard to its external connections with the Old School General Assembly, but only as a Presbyterian organization; and this last conclusion is fortified by the fact that the beneficiary was then at-

tached to the New School separatists from the Old School of Presbyterianism. It appears that the appellants, as now organized into a distinct church, independent of that of the appellees, both styled "Bethel Union," still adhere to the same doctrines and observances which characterized the "Bethel Union Church" at the date of that conveyance; while the appellees recognize the ultimate supremacy of the General Assembly over their church and its property, and the duty of all subordinate churches connected with that headship to submit to all its ordinances, and other acts of administration. Then the appellants constitute the identical church to whose use the deed of 1857 dedicated the property, although they do not adhere to the General Assembly, but stand independently of it, *as the same church, including the appellees, did when the deed was made.*

The fact that, some time after that conveyance, the members of that united church unanimously left the New and joined the Old School, did not either affect their identity, or, *per se*, subject their property to the jurisdiction of the General Assembly, or change their tenure of it so as to make it dependent on adherence to that council. According to this conclusion, the appellants, as a distinct church, are entitled to participation in the use of the dedicated property; but whether that right be exclusive or only alternate, we are not required to adjudge in this case.

But the appellees assume, that when the deed of 1857 was made, the members of the then undivided Bethel Union, attached to the New School party, contemplated a junction with the Old School, as afterwards, in less than a year, accomplished; and that, therefore, they expected to hold the property on condition of adherence to the General Assembly, and are as much subject to

that contingent tenure as they would be had the deed. itself so provided. This hypothesis is difficult to maintain on this record. But its truth would not, though presenting a new phase, essentially affect the title to the church property, because, as we shall now proceed to argue and adjudge, unconstitutional acts of the General Assembly detached the appellants from its jurisdiction.

From their first connection with that council until the churches, as well as the States, had become distracted by the late civil convulsion, the members of the Bethel Union Church had been signally blessed by Christian fraternity and concord, and, without disturbance, harmonized with the General Assembly; but the stultifying passions excited by that revolutionary commotion developed a general demoralization, as contagious in our ecclesiastical as in our political councils. In the rapid progress of moral deterioration, Congress and the General Assembly, each representing the Union section of the belligerents, seemed to co-operate, *pari passu*, in proscribing the revolting section and its sympathizers everywhere, and each body assumed undelegated powers, especially for enforcing "*loyalty*" and the abolition of slavery. Antecedently to that elemental war, fanatical abolitionists had, by premature and lawless disturbance of that domestic institution of many of the States, frenzied the popular mind and jeoparded the Union; and many professors of Christianity had sympathized with them in their reckless crusade, in defiance of the prophetic warnings of the most eminent and philanthropic of American Christians and statesmen.

But the General Assembly of the Presbyterian Church, while often *counseling* Presbyterians against *patronizing* slavery, had never advised a war against it, or made

opposition to it a test of religion, until the civil conflict had become flagrant. In the year 1838, the General Assembly published the following declaration: "The disposition among God's people is to be carried away with the exciting topics of discussion of the present day. *Many of God's people, instead of lending their talents, their influence, and their feelings to the great work of saving sinners, have given them another direction.* They have assisted in attracting the attention of the church and the world to other objects, which have so effectually engrossed the mind as to exclude the *peaceful truths of the Gospel and prevent their efficacy.*" *We will see* whether *this home-made cap does not fit the late assemblies.*

In the year 1845, the following question was propounded to the General Assembly: "Do the Scriptures teach that the holding of slaves, without regard to circumstances, is a sin, the renunciation of which should be made a condition of membership in the Church of Christ?" And the Assembly answered that question in the following words: "It is impossible to answer the question in the affirmative without contradicting some of the plainest declarations of the word of God. That slavery existed in the days of Christ and his Apostles, is an admitted fact; that *they* did not denounce the relation as sinful, as inconsistent with Christianity; that slaveholders were admitted to membership in the churches organized by the Apostles; that, whilst they were required to treat their slaves with kindness, and, if Christians, as brethren in the Lord, they were not commanded to emancipate them. The Assembly cannot, therefore, denounce the holding of slaves as necessarily a heinous and scandalous sin, calculated to bring on the Church of Christ the curse of God, without charging the Apostles of Christ with conniving at sin, introducing into the

church such sinners, and then bringing upon them the curse of the Almighty." We will also see whether late Assemblies have not tattered and torn this graceful cap.

These noble principles and prudent sentiments seem to have been faithfully observed by the Assembly until the year 1861; and, had that observance been continued until now, it *might* have been better for the Union, better for peace, better for both races, white and black, and much better for the cause of pure and evangelical religion. But that elevated neutrality in politics, which had eminently characterized the General Assembly in successive agitations of slavery, nullification, national bank, annexation of Texas, and other disturbing questions, yielding at last to the spirit of the civil war, the General Assembly, sitting in Philadelphia in the year 1861, so far fell from grace as to inaugurate its political partisanship, by a resolution pledging its devotion to the Union, and its support of the Federal administration in its efforts to put down the rebellion. The Synods of Kentucky, Missouri, New Jersey, and Pennsylvania, and many Presbyteries, recorded their disapprobation of that initial "*deliverance*" as unconstitutional and pregnant with mischief. The language of the Kentucky protest, moulded by two of her most distinguished Doctors of Divinity, the Rev. R. J. Breckinridge and E. P. Humphrey, was as follows: "This Synod contents itself with the expression of its grave disapprobation of this action of the General Assembly, which the Synod judges to be *repugnant to the word of God, as that word is interpreted in our Confession of Faith*."

The Synod of Missouri resolved, "that the action of the General Assembly, in relation to the political condition of the country, was unscriptural, unconstitutional, unwise, and unjust; and we, therefore, *solemnly protest*

against it, and declare it *of no binding force whatever upon the Synod, or upon* the members of the Presbyterian Church within our bounds."

Concerning the protest of the Kentucky Synod, the General Assembly of 1862 declared that "the General Assembly cannot approve of the Synod's disapproval of the action of the Assembly of 1861."

Thus a firebrand was thrown into the bosom of the church, which was fanned into a consuming flame by subsequent and more incendiary acts of the General Assembly, which became *more* and *more sectional and self-secularized.* The Assembly of 1862 also declared that the church was " agitated everywhere in the country, divided in sentiment in many places, and was openly assailed by schism in a large section of it;" that the Assembly had " the *authority* of the glorified Saviour, who was also the Sovereign Ruler of all things, to give utterance to the church, *the people, and to the civil authorities*," and then made this utterance : " This whole treason, rebellion, anarchy, fraud, violence, is utterly contrary to the dictates of natural religion and morality, and is plainly condemned by the revealed will of God ; " also, that " disturbers of the church ought *not to be allowed ;*" and finally, that " it may be well for this General Assembly to reaffirm, as it now solemnly does, the great principles to which utterance has already been given. We do this the more readily because our beloved church may then be understood *to take her deliberate and well chosen stand.*" This cap well befits the head of its manufacturer.

While President Lincoln's proclamation of emancipation had aggravated the horrors of the war, and perverted it from a defense of the Union into a military crusade against slavery, the General Assembly of 1864, without disguise, boldly entered the political field, and

espoused the cause of extirpating that domestic institution at once by force and in blood. It then made the following declarations: " The Assembly, in the name of the Presbyterian Church, expresses her thanks to Almighty God that the President of the United States has proclaimed the abolition of slavery within most of the rebellious States, and has decreed its extinction by *military force.* He has ordered the enlistment of soldiers of those *formerly* held as slaves in the national armies. *It is the President's declared policy not to consent to the reorganization of civil government within the seceded States upon any other basis than that of emancipation.*"

"*Our* communion must also be mindful of the fact that now, while multitudes of these *freedmen* are taught *the use of arms, and have been trained in military tactics, and inspired with the thought that they are now called of God to conquer for their people a position among the races of mankind,*" &c.

How far these extraordinary declarations of presumptuous dogmas, which have long vexed enlightened jurists and philanthropists, were consistent with the Constitution or the Bible, or wise economy or humanity, this court will not presume to say ; but it must say, that they signalized the Assembly as an intermeddling and revolutionary partisan in an unconstitutional, unholy, and bloody work of abolition by armies, and even servile war and insurrection.

The Assembly of 1865, after the close of the war, ordered all Presbyteries to examine southern applicants for admission into the church on the subjects of the rebellion and slavery, and to reject all who should admit their agency in the revolt, or their belief that slavery is an ordinance of God, unless " they give evidence of repentance for *their sin* and renounce their error." *It also en-*

*dorsed all the acts of the administration during the war, and specially* approved the military intervention of General Rosecrans in the organization of Presbyterian courts in Missouri, and published, what might have been expected, that " the spirit of true worship has almost fled from the sanctuary ; " and of that decay of the Christian spirit of faith and love, the belligerent conduct of the Assembly itself, contrary to both the ecclesiastical and civil constitutions, was not only proof, but an efficient cause.

As might have been expected, if the free and self-poised spirit of true Christianity still lived in the Presbyterian Churches, many of them remonstrated against the political interferences and intolerant proscriptions by the Assembly, as manifested by most of the foregoing " deliverances."

The most conspicuous of these protests was an argumentative document called "*The Declaration and Testimony*," signed by a multitude of Kentucky Presbyterians, and adopted by the Presbytery of Louisville in September, 1865. After arguing to prove the unconstitutionality of some of the Assembly's deliverances since 1861, and especially those of 1864 and 1865 on loyalty and slavery, this famous protest concludes in the following language :

" We declare our deliberate purpose, trusting in God, who can save by few as well as by many, to use our best endeavors to *bring back the church of our fathers to her ancient purity and integrity, upon the foundation of the Apostles and Prophets, and under the banner of our only King, Priest, and Prophet, the Lord Jesus Christ.* In this endeavor we pledge ourselves to assist and co-operate with each other. And, by the grace of God, we will never abandon the effort, no matter what sacrifices it may require us to make, until we shall either have succeeded in reforming the church and restoring her tarnished glory,

or, failing in this, necessity shall be laid on us, in obe-
dience to apostolic command, to *withdraw from those
who have departed from the truth.* Compelled to this
course, we will go, bearing with us the true Presbyterian
Church, with her doctrine, order, worship, and freedom,
as they have been given her by the Divine Head, and
transmitted from generation to generation by the hands
of saints, confessors, and martyrs."

The General Assembly of 1866 condemned that docu-
ment " as a slander against the Presbyterian Church,
schismatical in its character and aims, and its adoption
by any of our church courts as an act of rebellion against
the *authorities* of the General Assembly ; " and, arraigning
the signers and Presbytery at Louisville for trial at the
next General Assembly, resolved, that " until their case is
decided, they shall not be permitted to sit as members of
any church court higher than the Session ; " and also
declared, that if any Presbytery should, during that sus-
pension, enrol any such person, it should be " *ipso facto
dissolved.*"

The Assembly of 1867 required the remonstrants to
make humiliating acknowledgments as a *sine qua non* to
their restoration ; and declared that all who should refuse
to make such concessions should " be dropped from the
roll, *as having voluntarily withdrawn from the jurisdiction of
the Presbyterian Church of the United States of America,
under the care of the General Assembly; and they shall thence-
forth be regarded as being no longer ministers in or members
of said Presbyterian Church.*"

There were then in Kentucky six Presbyteries, one
hundred and sixty-three churches, one hundred and eight
ministers, and nearly twelve thousand members of the
Presbyterian denomination ; and of these, only thirty-
two ministers, twenty-eight churches, and about eighteen

hundred members, adhered to the General Assembly; and the residue, constituting a very large majority, unwilling to submit to what they held to be unscriptural and unconstitutional orders of the General Assembly, united on the "Declaration and Testimony" platform, and were, for this heroic recusancy, and for imputed insubordination and contempt, irregularly exscinded without trial. A recital of all the intermediate proceedings by all parties is deemed useless in the decision of this case. *They all betray the same unsanctified temper.*

The appellees, submitting to the General Assembly, and recognizing its asserted powers, continued under its assumed jurisdiction; but the appellants, uniting with the non-conformists, reorganized themselves as the Bethel Union Church, under the auspices of the excommunicated party. These conflicting communities of a dissevered church no longer communed together; but, by amicable arrangement, each party occupied the same house of worship on alternate days—the appellants on the first and third, and the appellees on the second and fourth Sabbaths of each month; but finally, the appellees, claiming the exclusive use of it, attempted to exclude the appellants altogether; and this litigation is the monstrous offspring of that unrighteous conflict.

"The Declaration and Testimony" was neither insubordinate nor contemptuous, unless it be insubordinate to act according to religious conscience, and contemptuous to vindicate the act by decent argument and bold appeal to the Bible, to the example of the Founder of Christianity, and to the principles of the Constitution of the United States, and of that of the Presbyterian Church founded expressly on the revealed will of God, all of which are supreme over the will of the General Assembly. Entertaining the opinions and principles which the

remonstrants professed, they not only had a moral and constitutional right to protest, as they did, but would have been guilty of recreance from their sacred duty had they, by servile submission to a false notion of the infallibility and supremacy of the Assembly, sacrilegiously stifled conscience, and prostituted religion at the shrine of usurped power. Right or wrong in their sentiments, they preferred the martyrdom of excommunication to hypocritical recantation and unconscientious co-operation in what they felt to be a wrongful perversion of free religion to an illicit connection with turbulent politics, and thereby adulterating both civil and ecclesiastical government; but for this manifesto and a consistent adherence to it, the Assembly renounced all connection with them. This it had the constitutional power to do, without civil remedy for any abuse of that mere power. Nevertheless, if its acts which were complained of were unconstitutional, and therefore void, the expulsion cannot affect property which the civil tribunals are bound to protect. Then, were any of those acts unconstitutional? We think that they were demonstrably so. But we deem it sufficient to illustrate this conclusion by the deliverances of 1864-'5 on loyalty and slavery. These, at all times, would have been unauthorized interferences with civil affairs; but the crisis aggravated their flagrancy. The seceding States asserted the doctrine of paramount allegiance to the individual States; the non-seceding claimed it for the Union; and this conflict of radical principles was an efficient cause of the insurrectional war. This difference in theory was not less sectional than the war itself. Each section denounced as treason what was loyalty in the other; and even in the Union sections there were various notions of loyalty to the National Government. While many rightly considered

devotion to the Constitution as the only true loyalty, a majority treated it as disloyalty when not subservient to all the acts of the Federal administration, constitutional or unconstitutional, right or wrong.

The sentiment on the subject of slavery was also essentially sectional, and was the proximate cause of the war. One party considered it a sin, and, treating it as a crime, advocated its extinction *at any time, under all circumstances, and by all possible means.* Many of the pro-slavery party tolerated it as legal, and others considered it a providential blessing to the black race, by translating barbarous and hopeless Africans to America, where they were rescued from the worst form of slavery, and secured from the doom of sacrifice, always imminent in their native country, and were gradually civilized and Christianized for their own exaltation and for the regeneration of their fatherland. They also thought that, when the white and black races co-exist on the same territory in such relative proportions as in this country, the security of both races required the subordination of the black to the white race, and that such subordination could not be secured otherwise than by slavery in some form; that, in the providence of God, those races are immiscible without great deterioration of the Caucasian blood and degradation of society; that the Union would never have been formed had not its architects conceded to each State the exclusive right to control all its domestic relations; and that, therefore, the Federal Government had no right, *in any mode,* to interfere with the institution of slavery; that the abolition of slavery, to be tolerable, must be spontaneous and gradual; and that the immediate and forcible emancipation of four millions of slaves would be a greater curse to both races than American slavery could be felt to be by any con-

siderate abolitionist; and this was the opinion of *Henry Clay*, a lifetime emancipationist, and also of Abraham Lincoln, who, though zealously anti-slavery, yet, not two weeks before the promulgation of his emancipation proclamation, published that he had no power to abolish slavery, and that if he had, he would not do it suddenly or forcibly, which he would apprehend as a greater evil than slavery itself.

Now, whatever may have been intended, the deliverances of the Assembly on loyalty, which it defined as co-operation with the Government in whatever it might do, and on the abolition of slavery at once, and even by servile war, must have tended to widen the breach, aggravate and prolong the war, and retard restoration; and there can be no candid pretense for saying that, by this conduct, so inflammatory and inopportune, the General Assembly did not try to guide civil affairs, and unconstitutionally intermeddled with vital questions in all-absorbing politics.

We will not debate so plain a question. The inevitable conclusion is, that the General Assembly itself forced the dismemberment of the Presbyterian Church by acts which are void for want of higher authority; and, consequently, even if the appellants held their interest in the church property by the tenure of adherence to the Assembly, a severance of that connection by the unauthorized acts of the Assembly cannot affect the title to the property. They are still, in every essential element of identity, the same "Bethel Union Church" as always hitherto. There might be more reason for saying that the General Assembly has lost its own identity. It is certainly not what it was always before the civil war. By its belligerent anti-slaveryism and political propagandism, it forced a division of one American and once

homogeneous church into two sectional and alien
.churches, and the disruption of the union between
itself and many dissenting churches of the Northern
section; and its changed conduct has, without any con-
stitutional amendment, practically made vital innova-
tions in its Confession of Faith and its constitution of
government. In this way, and by its excinding resolu-
tion of 1867, it compelled a dissolution of all ties of
government and allegiance between itself as organic
head of the church, and the appellants as a reorganized
and independent church. If the title to the church
property had been granted on the condition of con-
tinued connection with the General Assembly, still, if
that union has been dissolved by the unconstitutional
acts of the Assembly, the condition has become impossi-
ble, and the property, liberated from the condition, may
be held just as if there had never been such a limita-
tion; and upon the foregoing considerations we adjudge
that it may be so held now, even if the title should de-
pend on the conveyance of 1865; but, as before sug-
gested, the only valid title was passed by the deed of
1857, which contained no such condition; and in either
aspect of the title, the reorganized church of the appel-
lants, still called "Bethel Union," not having, as before
decided, lost its essential identity, the final conclusion
is, that the appellants, as now organized in a church
capacity, have a right to use the property of the "Bethel
Union" Church; but whether the appellees are entitled
to any use, we cannot decide on the issue made between
the litigants, whereby the appellants claim only one half
of the use, as stipulated by compromise.

Wherefore, the judgment of the circuit court is re-
versed, and the cause remanded, with instructions to
secure to the appellants, by all proper means, the un-

disturbed use of the church for one half of the time which may be dedicated to religious services.

The CHIEF JUSTICE, not having sufficient opportunity to investigate this case, reserves the right hereafter to file his own opinion, either concurring in the result or dissenting therefrom

CHIEF JUSTICE WILLIAMS, CONCURRING IN THE JUDGMENT OF THE MAJORITY OF THE COURT—THAT APPELLANTS WERE ENTITLED TO ONE HALF OF THE USE OF THE CHURCH PROPERTY—BUT DISAGREEING AS TO THE LAW AND REASONING LEADING TO SUCH CONCLUSION, DELIVERED THE FOLLOWING SEPARATE OPINION:

The Bethel Union Church of Presbyterians was organized in the year of 1828, and adhered to the General Assembly of the Presbyterian Church of the United States until the year of 1837, when, owing to divisions, the New School Presbyterians were excluded, and formed another General Assembly, to which the Bethel Union Church adhered, and so continued until in August, 1858, when, by the unanimous vote of its communicants, it returned to the Old School Church under Transylvania Synod of Kentucky.

The original deed to the church property now in controversy was made in the year 1857, whilst the Bethel Union Church adhered to the New School Presbyterians, but when it contemplated its return to the Old School Church, and only about a year before it did so actually return.

This deed was made to trustees in trust for the Bethel Union Church of Presbyterians, without any designation as to which General Assembly it adhered to.

This deed being consumed with the clerk's office and county records of Marion county during the late war,

Penick, the original donor of the land, made and acknowledged a new deed to the "Bethel Union Church of Presbyterians adhering to the General Assembly of the United States." Gartin and others having separated from adherence to said General Assembly, owing to divisions growing out of its deliverances on the subject of loyalty and slavery during the war, subsequently withdrew their membership from said church, and had gone into a new organization, with entirely new officers, including elders and deacons. The Bethel Union Church, with its old officers and organization, by official action, recognized this withdrawal; and it was agreed between the two parties that they should occupy the church house on alternate Sundays in each month, and did so continue until just before this litigation began.

After the making of the last deed, Gartin and his friends brought suit to set up the destroyed deed and repudiating this one; whereupon, Penick and his friends brought suit to enjoin the other party from any use of the church property. These suits being consolidated and heard together, the court refused to set aside the last deed, and granted a perpetual injunction against Gartin and his friends from using or disturbing the others in the use of the church house and property, which they seek to reverse.

By section 3, chapter 14, 1 Revised Statutes, 236, our Legislature has enacted that " no church or society of Christians shall be capable of taking or holding the title, legal or equitable, to exceeding fifty acres of ground, but may acquire and hold that quantity for the purpose of erecting thereon houses of public worship," &c.

By section 4 it is enacted, " in case a schism or division shall take place in a society, the trustees shall permit each party to use the church and appurtenances for di-

vine service a part of the time, proportioned to the numbers of each party."

By subsection 5 it is provided, that "the excommunication of one party by the other shall not impair such right, except it be *bona fide* on the ground of immorality."

This statute, founded upon the sublimest morality and exalted equity, should have a liberal construction and application, so that it may accomplish the just mission for which it was enacted, in meting out to contending parties even-handed justice, and preventing one party, under the guise of religious rites, from perpetrating on the other a great moral wrong and injustice, shocking to the moral sense of every enlightened community, and an infliction on the sensitive justice of the civil laws; also, preventing the civil courts from being embroiled in those contentions growing out of religious differences, the most flagrant and vindictive of all others.

By section 6, chapter 1, of the Presbyterian Form of Government and Discipline, it is provided, that " all baptized persons are members of the church; are under its care, and subject to its government and discipline ; and when they have arrived at the years of discretion, they are bound to perform all the duties of church members."

And in " The Directory for the Worship of God in the Presbyterian Church of the United States of America," as amended and ratified by the General Assembly in May, 1821, chapter 9, section 1, it is provided, that " children born within the pale of the visible church, and dedicated to God in baptism, are under the inspection and government of the church, and are to be taught to read and repeat the catechism, the Apostle's creed, and the Lord's prayer. They are to be taught to pray, to abhor sin, to fear God, and to obey the Lord Jesus Christ; and when they come to years of discretion, if they be free

from scandal, appear sober and steady, and to have sufficient knowledge to discern the Lord's body, they ought to be informed it is their duty and privilege to come to the Lord's Supper."

And by section 7, chapter 1, book 1, Form of Government, it is declared, "that all church power, whether exercised by the body in general or in the way of representation by delegated authority, is only ministerial and declarative. That is to say, that the Holy Scriptures are the only rule of faith and manners; that no church judicatory ought to pretend to make laws to bind the conscience in virtue of their own authority; and that all their decisions should be founded upon the revealed will of God."

These things are quoted to show that infants who are baptized into said church are recognized as members, and that it is enjoined upon the members to have their infant children baptized; and that all church power, instead of being inherent in the members, is merely ministerial and declarative, and founded upon the Holy Scriptures. In other words, that neither the separate churches, nor the aggregate thereof, in their separate church capacity and through their delegated officers, nor in their aggregated power in the higher church judicatories, up to their supreme tribunal, the General Assembly, derive church power from the separate churches, any of their judicatories, or the church constitution; but that all comes from the Lord Jesus Christ, as found in, and authorized by, the Holy Scriptures.

If the Presbyterian form of government and church constitution and organization have no higher and holier sanction than that of mere mutual contract between its members, its pretense of being the true Church of God must indeed be a hollow sham.

But how can infants, without volition, void of under-
standing, and wholly- incapacitated to express an idea,
contract or be contracted with?   Every writer on civil
jurisprudence lays it down as universal law, that there
must be parties capable of contracting, a thing to be con-
tracted about, a consideration, and then an actual agree-
ment, to make a valid contract.

In the Presbyterian Confession of Faith, chapter 23,
section 4, allegiance to government is taught and incul-
cated as a religious duty.   And in Baird's Digest is to
be found a pastoral letter upon the occasion of the old
French war, anterior to our revolutionary war of 1776—
one upon the repeal of the stamp act, and one upon our
revolutionary war; and previously to the formation of
the General Assembly, and subsequently to the adoption
of the Constitution of the United States, a synodical
address to Gen. Washington on his election to the Pres-
idency; and, as late as the year 1836, the General Assem-
bly ratified these deliverances, saying "they were our
fathers' principles."   (*Digest, book* 1, *sections* 7, 8, 9, 10,
14, 16.)

In 1787, before the formation of the General Assembly,
the General Synod, then the highest church tribunal of
Presbyterians, condemned slavery, and pledged the Pres-
byterian Church to do all in their power to promote its
abolition, consistent with the rights of civil society.

The General Assembly in 1793, by way of ratification,
ordered this deliverance to be printed as part of its
records.   In 1794, the General Assembly again expressed
its deep regret at "any vestige of slavery."   In 1816, it
again expressed its regrets that African slavery still re-
mained; and its deliverance in 1818 contains this lan-
guage: "We consider the voluntary enslaving of one
portion of the human race by another as a gross viola-

tion of the most precious and sacred rights of human nature, utterly inconsistent with the law of God." (*Minutes of* 1818, *p.* 692, *Baird's Digest.*)

Strongly anti-slavery as were these deliverances of the supreme judicature of the church, Kentucky Presbyterians seem to have been but little, if any, behind.

In Davidson's History of the Presbyterian Church of Kentucky, chapter 13, page 338, it will be found that the Kentucky Synod, in the year 1833, denounced "slavery a great moral evil, and inconsistent with the word of God;" and in 1834, the Synod appointed a committee of ten to prepare a plan for emancipation, who published their report in a pamphlet of sixty-four pages, in the year of 1835, which Davidson, in his history, page 339, says "fearlessly recounted the evils of slavery, its degrading influence, its dooming thousands to hopeless ignorance, its depriving them, in a great measure, of the privileges of the Gospel, its licensing cruelty, and finally its drawing down the vengeance of Heaven."

This committee, says the author, consisted of Hon. John Brown, Judge Green, President Young, Thos. Porter Smith, Chas. N. Cunningham, J. R. Alexander, Robt. Stuart, Jas. K. Bunch, Nathan Hall, and W. L. Breckinridge, men of great weight. From these and other historical facts, it may be truthfully said, without a violation of its history or just cause of offense to its members, that not only the aggregate Presbyterian Church of the United States was strongly and radically anti-slavery, but also that the aggregate Presbyterianism of Kentucky largely partook of these anti-slavery proclivities. Nor was this abolition tendency of the church concealed or apologized for, but, on the contrary, fearlessly and boldly promulgated and gloried in. It may be somewhat a matter of astonishment that, with this boldly proclaimed and fear-

less anti-slavery history, the church made such wonderful progress among slaveholders; and when they had become respectable and influential because of their numbers, their wealth, intelligence, and talents of their ministers, all that they sought or could obtain from their highest church judicatory was a guarded, feeble, and, to say the least, a questionable recognition that slaveholders might, per possibility, be Christians, as is fully indicated by the humiliating question, and the answer thereto, propounded to the General Assembly of 1845, as follows: "Do the Scriptures teach that the holding of slaves, without regard to circumstances, is a sin, the renunciation of which should be made a condition of membership in the Church of Christ?" To which the Assembly responded: "It is impossible to answer the question in the affirmative without contradicting some of the plainest declarations of the word of God. That slavery existed in the days of Christ and his Apostles, is an admitted fact; that they did not denounce the relation as sinful, as inconsistent with Christianity; that slaveholders were admitted to membership in the churches organized by the Apostles; that whilst they were required to treat their slaves with kindness, and if Christians, as brethren in the Lord, they were not commanded to emancipate them. The Assembly cannot, therefore, denounce the holding of slaves as necessarily a heinous and scandalous sin, calculated to bring on the Church of Christ the curse of God, without charging the Apostles of Christ with conniving at sin, in introducing into the church such sinners, and then bringing upon them the curse of the Almighty."

The guarded manner of putting this question, and the guarded answer thereto, were evidently intended as a mere bridge on which slaveholders could pass into the

church over the deep, wide, and strong current of aboli-
tion proclivities and sentiments which this church had
unceasingly poured upon the American people, and not
in the least intended as an indorsement of the institu-
tion of slavery, or a retraction of their long-formed and
deep-seated anti-slavery sentiments, but a mere admis-
sion that, with the surrounding circumstances, slavehold-
ers might be Christians.

Then, with its boasted anti-slavery history, its long-
cherished antagonistic sentiments to that institution,
together with its cherished history of taking sides with
the government under which it existed, in every war,
inculcating, as it did, among its Articles of Faith, loyalty
to the Government as a religious duty and a cardinal
virtue, when the Southern States had withdrawn from
the American Union with the avowed purpose of pro-
tecting their slavery institution, and which resulted in
the late war, and the Southern Presbyterian Churches
had withdrawn from the jurisdiction of the General
Assembly of the United States, and formed an eccle-
siastical jurisdiction of their own, adhering to the cause
of the "Confederate States," their antagonism to slavery,
and their sentiment of loyalty, stimulated by the ex-
citing surroundings, found a more violent and vehe-
ment utterance through their General Assembly, sanc-
tioned, as they supposed, not only by their Articles of
Faith, but under the plenary declared power found in
section 5, chapter 12, Form of Government, "of sup-
pressing schismatical contentions and disputations; and,
in general, of recommending and attempting reforma-
tion of manners, and the promotion of charity, truth,
and holiness throughout all the churches under their
care."

VOL. V—10

Having lost their foothold in the Southern States, the strong incentive to the bridge of 1845, their long pent-up anti-slavery sentiments, reinvigorated and stimulated by the exciting revolutionary times, with an increased velocity and resistless current swept away that frail superstructure.

Turning now from the history of Presbyterianism as represented by the General Assembly of the United States, it will be instructive to take a glance at Presbyterianism as represented by the General Assembly of the "Confederate States."

In the Synod of South Carolina, Old School, December 3, 1860, the report of the committee was unanimously adopted, containing the following extract: " The Synod has no hesitation, therefore, in expressing the belief that the people of South Carolina are now solemnly called on to imitate their revolutionary forefathers, and stand up for their rights. We have an humble and abiding confidence that that God, whose truth we represent in this conflict, will be with us, and exhorting our churches and people to put their trust in God, and go forward in the solemn path of duty which His providence opens before them, we, ministers and elders of the Presbyterian Church, in South Carolina Synod assembled, would give them our benediction, and the assurance that we shall fervently and unceasingly implore for them the care and protection of Almighty God." (*McPherson's History of Rebellion*, 508.)

The following is taken from the narrative on the state of religion of the General Assembly of the Confederate States, May 1, 1862: "All the Presbyterial narratives, without exception, mention the fact that their congregations have evinced the most cordial sympathy with the people of the Confederate States in their effort to

maintain their cherished rights and institutions against the despotic power which is attempting to crush them.

"Deeply convinced that this struggle is not alone for civil rights and property and home, but also for religion, for the church, for the gospel, and for existence itself, the churches in our connection have freely contributed to its prosecution of their substance, their prayers, and above all, of their members and the beloved youth of their congregations. They have parted without a murmur with those who constituted the hope of the church, and have bidden them to go forth to the support of the great and sacred cause, with their benedictions, and with their supplications for their protection and success. The Assembly desire to record, with its solemn approval, this fact of the unanimity of our people in supporting a contest to which religion, as well as patriotism, now summons the citizens of the country, and to implore for them the blessings of God in the course which they are now pursuing. In this connection, we would notice the fact that some of our ministers have entered the army as chaplains, and in the joint capacity of chaplain and soldiers, and are thus discharging a most important and useful office." (*McPherson's History of Rebellion*, 513.)

In the address of their General Assembly of December 4, 1861, "to all the churches of Jesus Christ throughout the earth," they say: "We are not ashamed to confess that we are intensely Presbyterian. We embrace all other denominations in the arms of Christian fellowship and love, but our own scheme of government we humbly believe to be according to the pattern shown on the Mount." (*Ib.*, 512.)

Whether, under the same article of faith, inculcating, as a Christian duty and cardinal virtue, loyalty to the government under which the church existed, or by the

authority of some provision of the church constitution, there is a remarkable coincidence in the action of the two General Assemblies. The one espousing the cause of the United States and the abolishment of slavery, the other the cause of the Confederate States and the protection of slavery, became equally belligerent, recognizing and approving the respective causes of their respective governments as that of right, morality, and religion, countenancing, approving, and encouraging, if not advising, their respective members in engaging in this fratricidal strife ; but perhaps an apology may be found for both in their church history and action, not only in the United States, but as originally understood in Scotland. In Stuart of Pardovan's Collection, book 1, page 15, section 25, it is said : "Church judicatures ought not to meddle, formally, with civil matters, no more than the State ought to meddle, formally, with matters ecclesiastic ; but the object, materially considered, may be the same, and fall under consideration both of church and State, in different respect."

If it be true that the Presbyterian Church is a homogeneous mass, with legislative, executive, and judicial powers combined in the same church authorities, and that all power is declarative and ministerial, and from the Lord Jesus Christ, as developed in the Holy Scriptures, and not inherent either in the individual members, separate churches, or church judicatories, it is hard to perceive why the Church Assemblies may not make deliverances on any question of morals or religion, though the same may also be matters of cognizance by the secular government.

Can there be any doubt that, notwithstanding the civil government permits as lawful the manufacture and retailing of ardent spirits, any church might prohibit its

members from engaging therein, and for a violation of such rule exscind them, and thereby take away all their rights to the church property? Cannot this church, under penalty of exclusion, require of its members to observe the first day of the week as the Christian Sunday, notwithstanding the State permits the citizen to select, according to his own conscience, which of the seven days he will keep? Or, to put a still stronger case, whilst the Mormons, in Utah Territory, not only inculcate as a religious privilege and duty, but also authorize by law, a multiplicity of wives, can there be any doubt that all churches prohibiting this could, in said Territory, exscind their members therefor, and thereby deprive them of all church rights and interest? And any church has undoubtedly the same power, however unwise and unjust it might be, to prohibit the holding of slaves by its members, just as it may prohibit these things. With the policy and provident exercise of church power civil courts have nothing to do. If, under the declared powers in the Form of Government and the Articles of Faith inculcating loyalty as a religious duty and cardinal virtue, the General Assembly exercises more power than some of the individual members or churches deem compatible with their well-being and happiness, still this does not disprove the power, but rather evidences an infirmity in the church organization.

In section 2, chapter 1, Form of Government, it is declared, " that in perfect consistency with the above preceding principles of common right, every Christian church or union, or association of particular churches, is entitled to declare the terms of admission into its communion, and the qualifications of its ministers and members, as well as the whole system of internal government which Christ hath appointed.

However uncharitable and unwise may have been the terms fixed for the admission into the church by the General Assembly of the United States since the close of the war, especially those of the same faith, yet, as a question of church power, under the above section, I apprehend there can be no doubt; nor, indeed, can it be doubted that all churches, in the very nature of things, must and do fix the terms of admission into their communion. Therefore, whatever I might think as an individual, as a judge I have no right to question the power; and, if disapproving as an individual, I can remain without admission.

Being strengthened by further investigation and observation in the views expressed in my dissenting opinion in the case of *Watson et al. vs. Avery et al.* (2 *Bush*, 363), that civil courts should never attempt to adjudicate ecclesiastical questions, and especially when determined by the church judicatories, but should confine their decisions to the strictly legal aspect of the question, whether this results from the action of the party or church authorities, I have gone somewhat at length into this rather interesting church history.

It may, perhaps, be proper to observe, that, as this slavery agitation in the church tribunals has been disastrous to the church, especially to the southern branch, so its agitation in the civil courts will likely be the Trojan horse that will develop within its citadel a most devouring enemy to the southern churches of all denominations.

If civil courts, regarding church constitutions and organizations as civil contracts, look into the action of church tribunals, and pronounce them violations of such contracts, and, therefore, null, there will scarcely be an adjudicated question by such tribunals that may not be reviewed in a secular court, in one aspect or another,

and under one pretext or another; and, of all other things this is most to be dreaded and shunned by the southern churches of all denominations.

In all the Federal domain south of Kentucky, to what Cæsar can they with confidence apply? Do the southern churches which identified themselves with the cause of the "Confederate States" desire that the civil courts, organized upon the negro-voting population of their States, should have jurisdiction to examine their church action, and test its validity by their church constitution as a civil contract? And is the destiny of these churches to be handed over to such civil courts that a few Presbyterian Churches in Kentucky may have the protecting care of her civil courts? Except Kentucky, Maryland, and Delaware, to which of the thirty-six Supreme Courts of the American States would these churches look with confidence? Which of fifty District Courts of the United States, or, soon to be erected, nine United States Circuit Courts, would they prefer to their own tribunals? If church constitutions are to be regarded as civil contracts, and, therefore, cognizable in the civil courts, when the Form of Government, Discipline, Articles of Faith, and Church History shall be considered by these southern courts, and the rights of the Presbyterian Churches, in connection with the General Assembly, adhering to the Confederate States, shall be by them reviewed and adjudicated, who can predict the fatal result to those churches; but, were the sad consequences which may flow from such cognizance by those civil courts to stop with them, the result would not be so melancholy, since, by the action of their friends, this devouring power has been invoked; but in this great civil maelstrom will be engulfed all other churches and denominations—the Methodist, Baptist, Episcopalian, Catholic, and Chris-

tian, and all others; for, when the jurisdiction of the
civil courts over the church constitutions and organiza-
tions, as civil contracts, is once firmly fixed, there will be
but few questions, immediately or remotely affecting in-
dividual rights in church property, which may be adju-
dicated in ecclesiastical courts, that may not also be
reviewed by the civil courts, and thus the independence
of church courts will be destroyed, the freedom of the
church from the State become a mere myth, and the
church tribunals will have to defer to the decisions of
the civil courts on their own constitutions and laws,
instead of being referred to as true expounders of their
own church constitution and doctrines, all of which will
finally prove equally disastrous to church and State;
and when the most eminent divines and highest church
judicatures of both divisions of this church, and both
ecclesiastical jurisdictions, assert the power and act upon
the subjects of slavery and loyalty, how a civil court can
deny to them this power, I am at a loss to know.

Whatever may be the doctrine of the British courts,
where there is an established church as part of the civil
policy, and, of consequence, within the jurisdiction of
the civil courts, and where, even in Scotland, Presby-
terianism is the established religion under a like civil
jurisdiction, yet that such is utterly un-American—not
only unrecognized, but utterly repudiated by the Amer-
ican courts—I will now proceed to show by specific au-
thorities.

In the case of *Shannon et al. vs. Frost et al.* (3 *B. Mon.*,
254), wherein a majority of the Baptist Church in Frank-
fort, without charge, citation, or trial, expelled a minority,
and which they insisted was irregular and invalid, and
without any good cause, and therefore could not affect
their property rights in the church house and lot belong-

ing to said congregalion, of which they had theretofore
constituted a part, this court, by CHIEF JUSTICE ROBERTSON,
said: " The rights of the parties in this case must de-
pend on the terms and legal effect of the conveyance,
and on the acts of the church for governing and pre-
serving itself as a distinct Christian society, and on the
common law of the land. What, then, are these rights
as thus stated? This court, having no ecclesiastical
jurisdiction, cannot revise or question ordinary acts of
church discipline or excision. Our only judicial power
in the case arises from the conflicting claims of the par-
ties to the church property, and the use of it; and these
we must decide as we do all other civil controversies
brought to this tribunal for ultimate decision. We can-
not decide who ought to be members of the church, nor
whether the excommunicated have been justly or un-
justly, regularly or irregularly, cut off from the body of
the church. We must take the fact of·expulsion as con-
clusive proof that the persons expelled are not members
of the repudiating church; for, whether right or wrong,
the act of excommunication must, as to the fact of mem-
bership, be law to this court.

" For every judicial purpose in this case, therefore, we
must consider the persons who were expelled by a vote
of the church as no longer members of that church, or
entitled to any rights or privileges incidental to, or re-
sulting from, membership therein. * * * The judi-
cial eye of the civil authority of this land of religious
liberty cannot penetrate the veil of the church, nor can
the arm of this court either rend or touch that veil for
the forbidden purpose of vindicating the alleged wrongs
of the exscinded members."

Could a stronger case be well imagined requiring the
interposition of the civil courts, had they the right to re-

gard the church organization as a civil contract, and all decisions in contravention thereof null and void?

The case of *Gibson ct al vs. Armstrong* (7 *B. Mon.*, 481) was a contest between different parties of a Methodist Church in Maysville, growing out of the ecclesiastical jurisdictional division of that church in the year 1844, a portion of the members adhering to the old jurisdiction of the General Conference of the Methodist Episcopal Church, whilst the other portion, with its church officers, together with the Kentucky Annual Conference, to which it belonged, adhered to the new jurisdiction of the Methodist. Episcopal Church, South.

This court, by Chief Justice Marshall, among many other things, in a lengthy review of the whole facts and case, said: "And we discover in them (rules of the church) no sanction that a minority of one of the societies of the church, separating itself from the major or organized portion, and assuming, at its own mere will, a new and independent organization, can, in its corporate form, claim any right of occupying their former house of worship, against the will of the remaining body, which, retaining the original organization, with the same officers and head, or their regularly appointed successors, and preserving the same position in the general organization, has, in point of fact, and in view of the law, these satisfactory evidences of its being the true society entitled to the use. Certainly the separating portion could not, by its own mere will, nor by assuming an internal organization conforming to the rules and discipline and usages of the church, nor by placing over itself a preacher of its own choice, nor by claiming to be the true and only society of the Methodist Episcopal Church belonging to the place, become *ipso facto* an organized portion of the general body of the church. Until recognized by the proper

authority of the church, and taken into connection according to its laws, it would stand as an isolated body, unconnected with the general organization, and independent of it."

Again it said : "It is for the authorities of the church, in the first instance, to judge of an infraction of its laws, and to determine whether the ecclesiastical jurisdiction belonging to any particular body or functionary of the association had been forfeited by such infraction. The civil judge might greatly apprehend that he would be transcending his proper sphere if he were to interpose in the first instance to determine such a question, and to enforce his judgment upon it."

These principles, so long recognized as part of Kentucky jurisprudence, and so unanimously approved by the jurists of the State, the churches, and people, should not be lost sight of or abandoned because of the disturbances of the late attempted revolution. Besides, they are in perfect accord and harmony with the adjudications of our sister States, as manifested in the following cases, all of which involved kindred church questions: *Deu vs. Bolton,* 2 *Green's C. R.,* 322 ; *American Primitive Society vs. Pellings et al.,* 4 *Zabriskie,* 659 ; *German Reform Church vs. Seibert,* 3 *Barr,* 291 ; *Sutter vs. Trustees Dutch Reformed Church,* 6 *Wright,* 503 ; *Commonwealth vs. Green,* 4 *Whar.,* 599 ; *Robertson vs. Bullions,* 9 *Barr's S. C. R.,* 78.

It is remarkable that not a single case in Kentucky, until the late case of *Watson vs. Avery* (2 *Bush,* 336), ever suggested or determined the rights of church litigants on the idea that church constitutions, creeds, &c., were to be regarded as civil contracts; and not a single case, either American or British, which I have seen, has predicated their rights on any such principle. The only American decision brought to view in any of these

church controversies which at all questions the validity
of ecclesiastical adjudications relative to church con-
stitutions, laws, and discipline, is the Vermont decision
in *Smith vs. Nelson* (18 *Vt.*, 511), and which, so far from
predicating its disregard of the ecclesiastical decision
upon the violation of the constitution and laws of the
church as a civil contract, expressly repudiates this by
the following explicit language. Said the judge deliv-
ering the opinion : " I cannot recognize any constitution,
laws, ordinances, or sentences of any ecclesiastical tri-
bunal, or of any voluntary society, as having any effi-
ciency or power over the civil rights, immunities, or
contracts of individuals."

What church is now willing to surrender its claim to
divine origin, and place the same upon the basis of mere
civil contracts between men ? Are even the Presbyte-
rians of the South willing to concede this ? Churches
claiming divine origin can no more place their church
constitution, laws, and powers on the basis of civil con-
tracts than can they so place the holy word of God. If
it is not a government authorized by, and deriving its
power from, the Holy Scriptures and God, their author,
then it is merely the work of men, and may be truly re-
garded as a civil contract, in the same light that human
governments and constitutions are.

Nor can a civil court look beyond its internal organ-
ization and external relation, where it has such relations
to other church judicatures, to ascertain the identity of
the church, as was fully developed by this court in *Gib-
son vs. Armstrong* (7 *B. M.*), and still later in the case
of *Harper vs. Stron* (14 *B. M.*, 55), which was a litiga-
tion between contending parties of an African Church,
each claiming to be the society of Asberry Chapel, to
whose use the property had been conveyed, and which

has many analogous points to the one now under consideration, and in which, like the present, the original deed was made in trust for the congregation called Asberry Chapel, without any reference to any external connection with any other church organization or jurisdiction. It, however, was under the superintendence of the Methodist Episcopal Church, South, with Harper as its pastor. Harper being expelled by the church authorities, his congregation went off with him, and continued to worship for some time under his superintendence, without connection with any other organization. Soon, however, both the congregation and their said pastor were received into the African Methodist Episcopal Church of the United States. Harper was sent by said church to another congregation, and Revel sent to this one. Harper, however, afterward returned to this congregation, and, being expelled from the African Methodist Church, induced a portion of its members to unite with him in organizing an independent Methodist Church; and, claiming to be the indentical old Asberry Chapel congregation, sued for the property. Revel still continued as the pastor of the remaining portion of the congregation, which also claimed to be the identical Asberry Chapel congregation; so here was a case purely of identity.

This court said: But the society continued to exist as an organized society, with the same officers, the same pastor, and the same records. The party which felt itself driven to reorganize in the old organization, had never before been an organized body or society of Christains, and, notwithstanding the assumption of the old name and the mystery of "reorganizing in the old organization," it cannot be, that, while that old organization remained complete and distinct, and competent to the performance of its proper functions, and to the en-

joyment of its rights, it could be merged in or superseded by the new organization.

So has been the teaching of this court through an unbroken current of decisions heretofore. When a congregation continues its local organization with the same officers, the same external jurisdictional connections, and adheres to the same articles of faith, it is impossible for the court to penetrate this veil, and to criticise the deliverances of its supreme tribunal, and then pronounce it disorganized, and say that seceding members organized by a different jurisdictional authority, though professing the same faith and church government, is the identical original church. This would set all our former decisions, and those of our sister States, utterly at defiance, and involves a proposition which would be at once rejected by all churches.

But if we should be driven back to the time of the organization of this church in 1828, to ascertain its creed and identity, candor would compel the admission that Presbyterianism was then anti-slavery in sentiment and action. Nor do Gartin and his friends, who withdrew from the old society, which still remained with all the elders and other officers, still adhering to the General Assembly of the United States, and organized under the synodical jurisdiction which recognized no relation to said General Assembly, but professed to be independent of it, claim to be the identical original Bethel Union Church, but do properly and legally claim to be entitled to participate in the use of said church property, as will now be shown.

There is a material and significant distinction between our statute of 1814, under which all previous decisions of this court as to the right of joint participation by contending parties have been heretofore made, and our

Revised Statutes of 1850, and which must govern this case, because the original deed has since been made.

The provisions of the statute of 1814, in case of a division or schism for other cause than immorality, were that nothing in said act should be construed to "authorize said trustees to prevent either of the parties so divided from using the house or houses of worship for the purposes of devotion;" nor were they to be construed "to authorize the minority of any church having seceded from, or been expelled, or excommunicated, to interfere in any manner in their appointments for preaching or worship with any appointments for similar purposes, which may have been made by the body or major part of such church or congregation."

As was said by this court in *Gibson et al. vs. Armstrong*, "the trustees were prohibited from using their authority under the statute to prevent either party from a proportioned use," because, as before said in the same case, they might be identified with one of the parties; but it did not mean to declare a right; whereas, by the Revised Statutes, it is positively and peremptorily enacted that the trustees "shall permit each party to use the church;" and the next subdivision provides that the "excommunication of one party by the other shall not impair such right, except it be done *bona fide* on the ground of immorality." It is, therefore, palpable, that the latter enactment declared a legal right in all members, when a division or schism occurs, for anything else than immorality, to still continue in the enjoyment of the benefits of the trust, according to the numbers of each party. The restricted operation of the statute of 1814, as construed by the courts, rendered it almost inoperative and useless, which was doubtless intended to be remedied by the revision, not only in the change of lan-

guage on this subject, coupled with an express declaration of right, but also by that provision which declares that courts shall give it a liberal construction to make it accomplish the objects designed.

This statute is just in its provisions, wise in its policy, and should have a liberal construction to secure its equitable benefits. I have no doubt as to its proper application in this case, and, therefore, concur in the reversal of the judgment; and am for a direction to the court below to reject the present and to set up the destroyed deed; and further, to secure to each party the alternate use of the church property *pro rata*, according to the number of communicant members adhering to each party at the time of their separation.